UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Wensink Farm Seeds, Inc., | ) | Case No. 3:16-cv-1282-JJH |
| | ) | |
|     Plaintiff/ | ) | Judge Jeffrey J. Helmick |
|     Counterclaim-Defendant, | ) | |
| | ) | |
|   vs. | ) | |
| | ) | |
| Howard N. Lafever *et al.*, | ) | |
| | ) | |
|     Defendants/ | ) | |
|     Counterclaimants. | ) | |

**Wensink Farm Seeds, Inc.'s**
**Opposition to Summary Judgment Motion**

{6253806:4}

Wensink Farm Seeds, Inc. ("Wensink Farm") brought this case to stop the unlawful anti-competitive activities against it by Howard Lafever ("Mr. Lafever") and French's Hybrids, Inc. ("French's") and to recoup the more than $50,000 that Wensink Farm spent on attorney fees to fend off their baseless seed lawsuit in state court. Defendants refuse to address the heart of Wensink Farm's complaint, and have not explained—for they have no explanation—how they could allege in state court that Wensink Farm was selling Mr. Lafever's seeds when they had scientific testing done _before they sued_ that proved that was not true. (*See infra* at p. 2.)

Instead of facing these serious allegations of litigation abuse, Mr. Lafever and French's (collectively, "Lafever" or the "Lafever parties") use diversion. They argue—based on a theory conceived after they were sued—that a written settlement formed when they signed a draft agreement that Wensink Farm did not sign. Because the parties understood that no settlement would exist unless everybody signed—as evidenced by Lafever signing and then asking Wensink Farm to sign—the admitted lack of signature by Wensink Farm is fatal to Lafever's "settlement" theory. That lack of signature is also fatal because of the statute of frauds. Under that statute, which applies because the purported agreement was to last more than one year, the alleged agreement is unenforceable against Wensink Farm because it did not sign.

Because Lafever failed to prove the existence of an enforceable agreement, the Court should deny summary judgment to Lafever, grant summary judgment to Wensink Farm on Lafever's counterclaim, and allow Wensink Farm to proceed with its case.

### Facts

I. **Parties**

Wensink Farm is a seed farm in Monroeville, Ohio. (Wensink Decl. ¶ 2.) For over 40 years, it has sold different varieties of crop seeds to farmers, including corn, soy, wheat, and

spelt. Spelt is a type of wheat. (*Id.* ¶ 3.) Farmers plant Wensink Farm's seeds to grow crops. (*Id.* ¶ 4.) Wensink Farm sells two types of spelt seed at issue in this case: Sabre and Sungold Max. (*Id.* ¶ 5.) Wensink Farm now refers to "Sungold Max" seed as "Ultra Max." (*Id.* ¶ 6.)

Mr. Lafever owns and operates "Sunbeam Extract Co." an unincorporated business in Indiana. (State Complaint ¶ 2, filed as ECF # 1-1.) Mr. Lafever claims that he developed two spelt varieties: "Sungold" and "Sava." (*Id.* ¶ 10.)

French's claims to sell "Sungold" under a license from Mr. Lafever. (*Id.* ¶ 20.)

II.  **State Lawsuit**

Lafever started this dispute in June 2015 when it sued Wensink Farm and another business owned by the Wensink family: Wensink Seed Farms, Inc. ("WSF"). Collectively, Wensink Farm and WSF are "Wensink" or the "Wensink parties." Lafever asserted eight causes of action against Wensink. Each of the eight claims was frivolous. For example, Lafever alleged that Wensink's "Sabre" seed was reproduced from, and the same as, Lafever's "Sava" seed. (State Compl. ¶ 17.) Yet, as Lafever would later disclose in discovery, Lafever had seed testing done by a seed expert at South Dakota State University *prior to* suing that confirmed Sabre "does not match Sava." (Wensink Decl. ¶ 9; Seed Report, att'd as Ex. W-2.) Lafever also claimed to have trademark rights to the "Sungold" name for seeds. Yet his selecting that name as a seed variety made it a generic term and, thus, disclaimed any trademark rights to the word.

Wensink answered Lafever's complaint in the state action and did not assert any counterclaims. (Wensink Decl. ¶ 10.)

During discovery, Lafever demanded Wensink's competitively-sensitive sales and financial information. (Wensink Decl. ¶ 11; Cavanagh Decl. ¶ 8.) Because Wensink had no conceivable liability in the case, Wensink objected to producing the information until the court

decided liability. (Wensink Decl. ¶ 11; *see also* Cavanagh Decl. ¶ 9.) On March 1, 2016, counsel for the parties discussed by phone Wensink's objection and the lack of merit to each of Lafever's claims. (Cavanagh Decl. ¶ 10.) During their call, Wensink's attorney told Lafever's attorney that the state court "needs to know what's going on here," and he stated that he would expose the frivolity of Lafever's case to the Judge and seek to stay damage discovery until after liability was decided. (*Id.*) During that same call, Wensink's attorney told Lafever's attorney over the phone that Wensink would be suing for malicious litigation and asked whether Lafever would oppose Wensink asserting it as a counterclaim in the state action. (*Id.* ¶ 11.)

Wensink's attorney followed up with an email on March 2 that repeated his request that Lafever consent to Wensink pleading malicious prosecution as a counterclaim and advised that, if Lafever objected, then Wensink would file a "new, independent action" asserting that claim. (*Id.* ¶ 13; M. Cavanagh Mar. 2, 2016, email, att'd as Ex. C-1.)

On March 9, 2016, Lafever dismissed the state action without prejudice. (Lafever Aff. ¶ 6, filed as ECF # 6-1.)

**III.    Settlement Discussions**

After dismissal, the parties' attorneys discussed the possibility of a settlement. (Cavanagh Decl. ¶ 14.) Lafever's unilateral dismissal had not ended the dispute because, by dismissing without prejudice, Lafever had reserved the right to re-sue and Lafever's baseless lawsuit had cost the Wensinks over $50,000 in attorneys' fees. (*Id.*) All settlement talks occurred *only* between Wensink's attorney, Matt Cavanagh, and Lafever's attorney, Connor Kinsey, and they communicated only by email and phone. (Cavanagh Decl. ¶ 20; Wensink Decl. ¶ 30.)

The parties and attorneys understood that there would be no binding settlement unless and until there was a written agreement signed by all parties. (Cavanagh Decl. ¶¶ 15-17; Wensink

Decl. ¶¶ 20, 25, 31.) In fact, Mr. Cavanagh said so in a March 22, 2016, email, in which he stated that the Wensink's "will require a signed settlement agreement" in order to settle. (Cavanagh Mar. 22, 2016 email, att'd as Ex. A to Lafever's Mot.; *see also* Cavanagh Decl. ¶ 15.) The Wensink parties never dropped that demand. (*Id.* ¶ 16.)

In an April 21, 2016, email, Mr. Cavanagh emailed a draft settlement agreement in Microsoft Word format for Mr. Kinsey to review with his clients. Mr. Cavanagh's email stated that the computer file was a "draft" for review, not a formal settlement offer. Indeed, the email began with language confirming that settlement was only at the "potential" stage: "For purposes of negotiating a *potential* settlement . . . ." (M. Cavanagh email (4/21/16), att'd as Ex. E to Lafever's Mot. (emphasis added).) Confirming that no settlement was effective until everyone signed a written agreement, the draft agreement that Mr. Cavanagh attached to his email stated: "The 'Effective Date' of this Agreement is the date on which *the last Party has signed*." (Draft Agreement at p. 1, Ex. F to Lafever's Mot. (emphasis added).)

While individuals within the Wensink business were considering whether to settle, Mr. Kinsey told Mr. Cavanagh that the two Lafever parties had signed the draft document. (Wensink Decl. ¶¶ 23-26; *see also* C. Kinsey Apr. 27, 2016, email, att'd as Ex. I to Lafever's Mot.) In the same email, Mr. Kinsey asked for Wensink's signature. (C. Kinsey Apr. 27, 2016, email ("Do you have Wensink's signature?").) Mr. Cavanagh responded that he would ask them to sign. (M. Cavanagh Apr. 27, 2016, email, att'd as Ex. J to Lafever's Mot.)

The Wensink parties declined Lafever's request to sign. They decided that they would not settle with Howard Lafever on the terms in the draft document because they viewed him as more culpable than his co-plaintiff French's in bringing and maintaining a knowingly-false lawsuit against Wensink. (Wensink Decl. ¶ 27.) Mr. Cavanagh emailed Mr. Kinsey back, told him the

{6253806:4}  4

Wensink's decision, and offered to revise the draft document to carve out Mr. Lafever if French's was willing to settle without Mr. Lafever. (M. Cavanagh May 11, 2016, email, att'd as Ex. K to Lafever's Mot.)

Mr. Kinsey responded to Mr. Cavanagh by phone, told him that French's was not willing to settle without Mr. Lafever, and stated that he would tell his clients to "expect a lawsuit." (Cavanagh Decl. ¶ 18.) Mr. Kinsey did not state or give any indication that he believed the parties had formed a binding settlement agreement. (*Id.* ¶ 18.)

### IV.  This Lawsuit

Wensink Farm filed this lawsuit on May 26, 2016. It seeks: (i) declaratory judgments that reciprocate the claims that Lafever brought in the state action; (ii) damages for the malicious litigation brought by Lafever; and (iii) damages and injunctive relief against false advertising by Lafever that states or implies that propagation and sale of his Sungold seed is prohibited by law.

Lafever responded with a counterclaim for "Breach of Settlement Agreement," and moved for summary judgment on that counterclaim. Lafever's filing of its counterclaim was the *first time* that it expressed any belief that a binding settlement existed. (Cavanagh Decl. ¶ 19.)

### Response to Lafever's "Undisputed Material Facts"

Lafever begins its brief with three pages of "Undisputed Material Facts" that appear to be copied verbatim from Mr. Lafever's affidavit. (Lafever Mot. at 2-4.)  Mr. Lafever's "facts" are neither "undisputed" nor "material." The only possibly admissible evidence that Mr. Lafever provides is his testimony that he signed the draft agreement, (Lafever Aff. ¶ 19), and the attorney emails that he attached as exhibits to his affidavit (ECF # 6-2.) The Court should strike or ignore everything else in his affidavit as immaterial, not based on personal knowledge, or both.

{6253806:4}                                      5

In paragraphs 3 to 8 of Mr. Lafever's affidavit, he says why he dismissed the state action and why his dismissal was "without prejudice." (*See* Lafever Aff. ¶¶ 3-8; *see also* Lafever Mot. at p. 2-4.) Mr. Lafever claims his "analysis" told him to dismiss because it was not "cost-effective" to proceed, and he says he dismissed "without prejudice" so he could reassert his claims if Wensink Farm sued him later for its attorneys' fees. (*Id.*) Wensink Farm disputes this and says Lafever dismissed because the frivolity of his claims was about to be exposed to the state court, he wanted to avoid an adverse judgment, and he dismissed "without prejudice" so he could maintain a threat of lawsuit over Wensink Farm to deter it from competing against Lafever. (Wensink Decl. ¶ 18.)

Why Lafever dismissed the state action, however, is immaterial because it has no bearing on whether there is a binding contract between the parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("Only disputes over facts that might affect the outcome" matter). Indeed, Lafever's motion does not rely on its purported reasons for dismissal as a basis for any of its legal arguments in favor of a contract. (*See* Lafever's Mot. at 6-8.) Thus, the Court should ignore paragraphs 3 to 8 of Mr. Lafever's affidavit as immaterial and, therefore, inadmissible under FRE 401 and 402. If the Court believes those paragraphs are material, then it should nonetheless deny summary judgment because Thomas Wensink's declaration, at a minimum, creates a genuine issue of material fact regarding Lafever's motives. (Wensink Decl. ¶ 18.)

Paragraphs 5, 9-18, and 20-23 of Mr. Lafever's affidavit contain statements, often conclusory ones, about what the parties' attorneys said to each other. The attorneys' discussions, however, occurred only by email and telephone. (Cavanagh Decl. ¶ 20.) As to emails, the Court can read them for itself, so that Mr. Lafever's interpretations of their meaning are irrelevant.

As to the attorneys' telephone conversations, Mr. Lafever was not present for those calls and, accordingly, his testimony about what they discussed is inadmissible for lack of personal knowledge under FRE 602. It also is inadmissible hearsay (FRE 801 *et seq.*) because anything Mr. Lafever says he knows about the calls could only have been based on what his attorney told him about them. While one may testify first-hand about what he heard someone else say during negotiation without violating the hearsay rule, someone who was not present may not testify second-hand about what others told him was said. *See* FRE 801, 802. Thus, Mr. Lafever's affidavit provides no foundation to establish his personal knowledge of what Mr. Cavanagh or Mr. Kinsey said or did not say to each other during their one-on-one phone conversations. The only admissible evidence about the attorney phone calls is Mr. Cavanagh's declaration.

As explained in the foregoing sections, viewing the admissible evidence in favor of Wensink Farm, Lafever has failed to prove the existence of a binding settlement agreement. The Court should deny summary judgment accordingly.

## Law and Argument

**I.  A party seeking summary judgment on claims for which it bears the burden of proof must prove its case dispositively—an exceptionally hard task.**

A summary judgment movant must show two things: (i) "that there is no genuine dispute as to any material fact," and (ii) "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether movant met its burden, the Court must "view all the evidence and draw all reasonable inferences in favor of the nonmoving party." *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 891 (6th Cir. 2016).

Lafever bears the burden of proof on its breach of contract counterclaim. *Nilavar v. Osborn*, 127 Ohio App.3d 1, 11 (1998). When, as here, a party seeks summary judgment on a claim for which it has the burden of proof, the movant's burden is difficult and therefore rarely

met. *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir. 1998) ("Summary judgments in favor of parties who have the burden of proof are rare, and rightly so.").

The movant "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *see also Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (movant must present evidence "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

**II    Lafever's motion fails because it did not prove a contract exists.**

    **A.    When parties intend to contract only by signature, they are not bound unless they sign.**

Settlements are contracts and, therefore, contract law dictates whether they exist or not. *Bernabei v. St. Paul Fire & Marine Ins. Co.*, No. 2004CA00148, 2005-Ohio-575, ¶ 12, 2005 WL 351754 (Ohio Ct. App. Feb. 14, 2005). A contract requires both an offer and acceptance. *Id*.

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24. "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26.

"In Ohio, when parties intend that their agreement shall be reduced to writing and signed, no contract exists until the written agreement is executed." *Curry v. Nestle USA, Inc.*, 225 F.3d 658 (Table), No. 99-3877, 2000 WL 1091490 (6th Cir. July 27, 2000).

## B. The parties intended that signatures were required to settle.

Here, Wensink Farm made no offer because they had not signed the draft document, so that more than Lafever's signature was required to conclude a bargain. The parties intended that, to be binding, any agreement must be reduced to writing and signed, and there are myriad objective indicators of that shared intent.

First, in their early talks, Mr. Cavanagh told Mr. Kinsey that, to settle, the Wensink's "will require a signed settlement agreement," and the Wensink's never dropped their signature requirement as a term of settlement. (M. Cavanagh Mar. 22, 2016, email, att'd as Ex. A to Lafever's Mot.; *see also* Cavanagh Decl. ¶¶ 15-16.)

Second, the "draft" settlement agreement stated that its "Effective Date" is "the date on which the last Party has signed." (Draft Agreement at p.1, att'd as Ex. F to Lafever's Mot.) Thus, the draft agreement does not, and cannot, become effective until the last party has signed, which never happened. It does not say that it was already effective, effective on a date certain, or that it becomes effective when the "first" two parties have signed, which is what Lafever is contending contrary to the language in the purported agreement.

Third, the draft document that Mr. Cavanagh emailed to Mr. Kinsey was not signed by the Wensink parties. If, as Lafever contends, the document was sent as an offer that could be accepted with finality by the Lafever parties signing, then it would have been signed by the Wensink parties. The blank spaces for the Wensink parties' signatures, and the draft's statement that it does not become effective until the "the last party has signed," put Lafever on notice that Wensink did not "intend to conclude a bargain until [it] has made a further manifestation of assent," namely signing the agreement. *See* Restatement (Second) of Contracts § 26.

Fourth, the draft document included a term requiring that "[a]ny modification of this Agreement must be in writing and signed by all Parties." (Draft Agreement at ¶ 12, att'd as Ex. F to Lafever's Mot.) It would be inconsistent and illogical to find that the Wensink parties would have intended to bind themselves to an entire agreement without signature, yet would require signatures by all parties for any modifications to that agreement.

Fifth, the email by which Mr. Cavanagh sent the draft document referred to it as a "draft," said it was sent for "your and your client's review," did not ask for signatures (but instead asked for "edits or comments"), did not state it was an offer, and used tentative language signaling that the parties were still at the negotiation stage: "[f]or purposes of negotiating a potential settlement," "if we are able to reach agreement," and "if a settlement is not reached." (M. Cavanagh Apr. 21, 2016, email, att'd as Ex. E to Lafever's Mot.)

Sixth, when Mr. Kinsey told Mr. Cavanagh that Lafever had signed the draft document, Mr. Kinsey expressed his understanding that a settlement had not been consummated by asking: "Do you have Wensink's signature?" (C. Kinsey Apr. 27, 2016, email, att'd as Ex. I to Lafever's Mot.) Mr. Kinsey's request for Wensink's signed assent, confirms that he knew more was required to settle. Indeed, the fact that the Lafever parties signed the draft document confirms their understanding that signatures were necessary to bind the parties.

Seventh, on May 11, Mr. Cavanagh told Mr. Kinsey that Wensink was willing to settle with French's, but not with Mr. Lafever, on the draft terms. (M. Cavanagh May 11, 2016, email, att'd as Ex. K to Lafever's Mot.) Yet Mr. Kinsey did not object and say, "Hey, we already have an agreement" or anything like that. Instead, Mr. Kinsey responded to Mr. Cavanagh by phone, told him that French's declined the Wensink offer, and ended the call by stating that he would tell his clients to "expect a lawsuit." (Cavanagh Decl. ¶ 18.) If Mr. Kinsey thought a settlement had

been finalized in April, he would not have asked French's whether they would settle without Mr. Lafever the following month, and his response to Mr. Cavanagh's May 11, 2016, email offer would have been an objection that a settlement had already formed. Mr. Kinsey never expressed any belief that a binding settlement had been reached until he moved for summary judgment. (Cavanagh Decl. ¶ 19.) The Lafever parties and their attorney's pre-suit conduct is inconsistent with their litigation position here that an agreement formed in April 2016. Meanwhile, Wensink's conduct—including its filing of this lawsuit—has remained consistent with its position that no binding agreement formed.

The reasons why there is no binding settlement here are similar to why there was no settlement in *Bd. of County Comm'rs of Wood County v. City of Toledo*, No. 92WD086, 1993 WL 372243 (Ohio App. 6th Dist. Sept. 24, 1993). There, as here, a party that had received an unsigned draft agreement for review, signed it, and then later contended that the other party—the party that had not signed—was contractually bound. As here, "the fact that the 'draft' contract was unsigned should have provided [the other party] with notice that a further manifestation of assent was necessary." *Comm'rs of Wood County*, 1993 WL 372243, at *6. Thus, in both cases, the parties were engaged in settlement negotiations that contemplated a signed settlement agreement. But because one side never signed, no binding agreement was formed.

This is unlike the *Tocci* case that Lafever cites, where the parties had reached an oral agreement before a Magistrate Judge who "testified unequivocally that the parties . . . had 'absolutely' reached agreement during the two-hour mediation session." *Tocci v. Antioch Univ.*, 967 F. Supp. 2d 1176, 1196 (S.D. Ohio 2013). Here, Lafever does not contend that an oral agreement had been reached and, instead, claims the agreement is written. And that writing cannot bind Wensink Farm because the parties' conduct and statements, and the document itself

(*see supra* at pp. 4, 9-10.), confirm their understanding that no one would be bound to that written agreement without signing it.

Indeed, the Wensink parties felt comfortable negotiating because they knew they could not be bound until signing. (Wensink Decl. ¶ 20.) To now bind them because their attorney sent a draft document for everyone's review would be unfair, punish them for talking settlement, be contrary to their expressed intent, and create law that would deter parties from working on settlement out of fear that there good faith efforts toward settlement may be used against them. *See Owens v. Bailar*, No. 2008CA29, 2009-Ohio-2741, 2009 WL 1636135 (Ohio Ct. App. June 5, 2009) (reversing trial court's decision to enforce an unsigned settlement agreement). The Court should deny Lafever's motion accordingly.

III. **Lafever's motion also fails because of the statute of frauds.**

   A. **The statute of frauds requires agreements that last for more than one year to be in writing and signed.**

The statute of frauds requires any agreement that lasts more than a year to be in writing and signed by the party against whom enforcement is sought. It states:

> No action shall be brought . . . upon an agreement that is not to be performed within one year from the marking thereof; unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

Ohio Rev. Code § 1335.05.

In *Olympic Holding*, the Ohio Supreme Court held that a proposed joint venture agreement was unenforceable under the statute of frauds. That was because the joint venture was to last more than one year and there was no signed, written agreement. *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 122 Ohio St.3d 89, 98-99, 909 N.E.2d 93 (2009).

Based on the one-year provision of the statute of frauds, alleged settlement agreements with covenants not to sue that last more one year are unenforceable unless signed. *See Solaia Tech. LLC v. ArvinMeritor, Inc.*, No. 02 C 4704, 2006 WL 695699, at *11-12 (N.D. Ill. Mar. 16, 2006) (denying motion to enforce settlement and citing cases).

**B. The purported settlement agreement would last more than one year.**

The purported agreement is not enforceable without Wensink's signatures because it includes provisions that cannot be performed within one year. Most notably, paragraph one of the purported agreement includes a covenant not to sue by which "Lafever and French's each covenant not to sue any of the Wensink Released Parties on any of the Lafever Released Claims." (Draft Agreement ¶ 1, att'd as Ex. F to Lafever's Mot.) Paragraph one defines the "Lafever Released Claims" to include each of the claims that Lafever asserted against Wensink in the state action. The statute of limitations for many, if not all, of the claims for which Lafever allegedly covenanted not to sue expire more than one year after the alleged date of making, *i.e.*, after April 23, 2017. (*See* Lafever Aff. ¶ 19 (asserting April 23, 2016, as date of contract).)

For instance, Lafever's Count 1 in the state action alleges that Wensink breached a written contract by "reproducing and selling Sava under the trade name 'Sabre.'" (State Compl. ¶ 29, filed as ECF # 1-1.) According to Lafever's complaint, that alleged breach began "[i]n or around October of 2013." (*Id.* ¶ 17.) Because the statue of limitations for breach of a written agreement is eight years after accrual, R.C. 2305.06, the statute expires, at the earliest, in October 2021. Thus, the covenant not to sue obligation would last at least five years after the alleged date of the purported settlement's making.

As another example, Lafever's Count 6 alleges that Wensink allegedly reproducing and selling Sungold Max is misappropriation of trade secrets, (State Compl. ¶¶ 11, 25-26, 56), which

has a four year statute of limitations, R.C. 1333.66. According to Lafever's complaint, Wensink began reproducing and selling Sungold Max in September 2014. (State Compl. ¶ 25.) Thus, the statute of limitations would expire, at the earliest, in September 2018. This makes the covenant not to sue duration over two years long.

Because the covenant not to use imposes obligations that could not possibly be performed in one year or less, the statue of frauds applies. And because it is undisputed that Wensink Farm did not sign the purported agreement, Lafever cannot sue it on that alleged contract.

### IV. Lafever never attempted to prove, much less dispositively prove, that the purported release would apply to Counts 1 through 3 in Wensink Farm's complaint.

However the Court decides the contract issue, it should deny summary judgment to Lafever on Counts 1-3 in Wensink Farms' complaint. The purported release provision (paragraph 2 of the draft agreement) would require Wensink to release only three types of claims: (i) those that Wensink Farms asserted in a prior state lawsuit between the parties; (ii) those that Wensink Farms could have asserted in the prior action "and that arise out of the same transactions or occurrences at issue in" that action; and (iii) any claim for attorneys' fees based on Lafever filing and maintaining the state lawsuit against Wensink Farm. (Draft Agreement ¶ 2.)

Counts 1-3 in the Wensink Farm complaint challenge false statements by Lafever that the sale and propagation of certain seeds are prohibited by law. (Compl. ¶¶ 22-29, 38-51.) Because the false statements by Lafever are different transactions and occurrences than what was litigated in the state action (and they are different from the state action itself), the purported release provision could not possibly apply to Counts 1-3. (*Compare* Compl. ¶¶ 22-29 (describing false statements) *with* Compl. ¶¶ 30-37 (describing sham lawsuit).) This is likely why Lafever's motion makes no mention of those claims, and it does not argue that the purported release would apply to them.

Therefore, the Court should deny summary judgment on Counts 1-3 on the additional ground that Lafever failed to prove, let alone dispositively prove, that those claims fall within the scope of the putative release term.

**V.     The Court should not only deny summary judgment to Lafever; it should grant summary judgment to Wensink Farm.**

Based on the foregoing, Lafever has failed to meet its burden to prove the existence of an enforceable contract. Therefore, the Court should deny summary judgment to Lafever. Because the facts, even when viewed in a light most favorable to Lafever, do not establish the existence of an enforceable contract, the Court should grant summary judgment to Wensink on Lafever's breach counterclaim. The Court should do so because, by asking the Court should decide its counterclaim now as a matter of law, Lafever has invited a ruling (good or bad), such that it now has had the "notice and a reasonable time to respond" that Fed. R. Civ. P. 56(f)(1) requires before the Court grants summary judgment to a non-movant.

## Conclusion

For the foregoing reasons, the Court should deny summary judgment to Lafever on its counterclaim and grant summary judgment to Wensink on that claim.

Respectfully submitted,

Dated:  August 1, 2016

　　/s/ Matthew J. Cavanagh
Matthew J. Cavanagh (OH 0079522)
MCDONALD HOPKINS LLC
600 Superior Avenue, East, Ste. 2100
Cleveland, Ohio 44114
t 216.348.5400 │ f 216.348.5474
mcavanagh@mcdonaldhopkins.com

*Counsel for Wensink Farm Seeds, Inc.*

<u>Certificate of Service</u>

I hereby certify that on August 1, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt, and parties may access this filing through the Court's system.

    <u>s/ Matthew J. Cavanagh</u>
*Counsel for Wensink Farm Seeds, Inc.*

{6253806:4}

<u>L.R. 7.1(f) Certification</u>

In accordance with Local Rule 7.1(f), I hereby certify that this case is on the standard track and that the foregoing memorandum complies with the applicable page limitation of 20 pages.

    s/ Matthew J. Cavanagh
*Counsel for Wensink Farm Seeds, Inc.*

{6253806:4}